Our second case this morning is No. 14-1525, Biogen v. Japanese Foundation. Mr. Fick. Good morning, Your Honors, and may it please the Court. I'd like to start with the subject matter of jurisdiction decision in the District Court. AIA Section 3 contains the amendments that transition our patent system from first to first inventor to file. Section 3 in 1 of the AIA states unambiguously that the amendments of Section 3 shall apply to patents and patent applications with effective filing dates after those amendments took effect on March 16, 2013. It does not say that only some of those amendments shall apply. It says the amendments shall apply. Do you agree that apart from 3N that you don't have an argument that 146 applies? Well, I would agree, Your Honor, that 3N1 is the provision of the AIA that provided for a transition from first to file to first to invent. And that is the provision that says that the amendment to Section 135, the amendment to Section 146, only apply to patents and applications with effective filing dates after March 16, 2013. So your whole argument rests on 3N? 3N1 we believe is controlling, yes. And then I guess the main concern I have is what do we do about 6F3C where there's a specific provision that expressly authorizes judicial review from certain interferences. And then if we take that on its face, that appears to create a problem with your reading of 3N1 in the sense that your reading of 3N1 renders that provision in 6F3C with respect to 146 superfluous. I know that is an argument that the appellees have made. It is wrong. I think if you look at sort of what Congress did here, it said what do we do with the patents and applications that were filed under the first to invent laws? It would be unfair to treat them under the new first to file laws. And so it provided in 3N1 that we're only going to apply the first to file laws to patents and applications that were filed under the first to file laws. In other words, after March 16. And that works fine because if you look at Section 146 and Section 135, you can apply the earlier versions to those proceedings. The only problem is that those pre-AIA versions of those statutes refer to the BPAI and not to the PTAB. But Congress recognized that and they took care of that in Section 7A1 that says when you see a reference in the statute to BPAI, you should deem that to be PTAB. So it's very clear that Congress dealt with those pre-AIA patent applications in that way. The problem that I think Congress then saw was that this is fine for interferences that were declared on or after September 16th of 2012, but it doesn't take care of the interferences that were filed before then. And the reason for that is that Section 7A that has that shall be deemed language in it, the effective date of that was September 16th, 2012, and Section 7E says that that amendment in Section 7 only applies to proceedings that were after September 16th, 2012. And so the point here is you have a clean line of demarcation. Section 6F3C took care of interferences that were declared before and pending as of September 16th. It's not as though you're saying that it's just straightening out a terminology issue, which would have been easy to do in some other way. It doesn't really explain, to me anyway, why we've got 6F in the statute, which seems to be very specific and doesn't tie it to the filing date of the patent, but to the date of the commencement of the interference proceeding. I'm having trouble understanding why Congress would have enacted this rather detailed provision here just to deal with what you say is a terminology issue. Well, it may very well be that Congress could have done this differently, I don't know, but what we have to deal with is what they said. Well, that's your problem. And what they said is, no one disputes, 6F3C only applies to interferences that were pending on and declared before September 16th, 2012. If you put aside the terminology question that you were arguing, why do you need 6F under your view of 3N? Because 3N only applies to proceedings that were declared after September 16th, 2012. And the reason for that is the statutory provision in 7A that says you shall deem the BTAI to be the PTAB does not apply to proceedings declared before September 16th, 2012. So there is a very clean line of demarcation. Whether Congress might have done it differently... I'm not seeing that. Here we have this provision that says it depends on when it was commenced, and then in 3N under your reading of it we seem to have something which is inconsistent that depends on when the patent application was filed. Yes, 3N, the shall apply language in section 3N has to mean something. Now, what the district court said was when the 3N amendments came into effect it swept away all of the old provisions of the law. Well, we know that's not true. Well, 3N has meaning because it's dealing with when the first to file rule comes into effect and so it focuses on the date of the filing of applications, right? Yes, but it says the amendments of section 3 shall apply. Among the amendments in section 3 are the 3I amendments to section 135 and the section 3J amendments to section 146. And it says they shall apply to patent applications with effective filing dates after March 16th when the first to file amendments came into effect. And the shall apply language has to have meaning. And if you look at the very next section of section 3N, there they're dealing with very special kinds of cases that have mixed claims where the applicant is trying to get filing dates both before and after the first to file amendments. There they specified only three of the provisions are preserved. In contrast, in section 3N it says the amendments shall apply. I don't think there's any basis for reading a limitation into that. And going back to your earlier question, Your Honor, 3N and 6F3C are entirely compatible with one another because 6F3C only applies to these interferences that were declared by the BPAI and that were pending before the BPAI as of September 16th, 2012. 3N, which applies to pre-AIA versions of the statute, only apply to proceedings that were declared after September 16th, 2012 and only apply to pre-AIA patents and applications. So I think these two provisions have different purposes and they apply to interferences declared at different times. The district court attached some significance to the technical correction amendment. What do you have to say about that? Well, the technical correction amendment recognized... The reason for that was that Congress... Specifically what's at 126, 126 stat 2458 in your addendum. Yes, and it was section 1K3, I believe. Yes. When Congress enacted the AIA initially, in section 7C of the AIA, it delineated the proceedings that are reviewable by this court. It forgot to include review of section 1 of interference decisions. It was simply an interference oversight. You're saying the fact that 146 isn't mentioned in this provision is just an oversight. No, no. It was not an oversight at all. 146 review was not restored because it was never eliminated in the first place. Because 146 review was preserved by section 3N1, which says the pre-AIA version of 146 applies to proceedings after September 16th, 2012. So your view is that given your reading of 3N1, you're saying the technical correction amendment provision doesn't really bear on you. It doesn't have anything to do with this. There's no question Congress had to fix the fact that it inadvertently eliminated federal circuit review. It didn't have to restore 146 review because it had not inadvertently deleted it in the first place. Is there any legislative history, by any chance? No, and I think, Your Honor, that's significant. I mean, basically what the appellees are arguing here is that Congress did away with 146 review, a review that has important purposes and had existed for over 100 years. It did away with it for everything up to September 16th, 2012. Then it eliminated it for that six-month period between September 16th, 2012 and March 16th, 2013. And then it restored it. That makes no sense. And it did all of this without... Are you talking about 146? Yes. I don't think the other side is suggesting that it restored 146 after March 16th, 2012. Yeah, they've acknowledged that 146 is restored for derivation proceedings. Okay, for derivation proceedings, but not for interferences. The only thing that changed in Section 146 with the AIA was the word interference was replaced with derivation proceedings. And so if 146 review was viewed so negatively by Congress, one would wonder why did they keep it for derivation proceedings. And anyone that's ever been involved in a derivation proceeding knows that they are as fact-intensive and can be as complicated as priority contests. Right, but there is that one statement by Congressman Smith with the Technical Corrections Act where in support of that act, he suggested that we need to do Section 1K3 in order to authorize interference proceedings and judicial review for interferences that are declared after September 16th or on or after September 16th, 2012. Yeah, and what he said is so the courts can review, but what they restored was review by this court because the review by this court was the only thing that was inadvertently omitted by the original AIA. Could I bring you back for a moment to 3N and there's the word and in there. I'm sorry, Your Honor. 3N. 3N1. 3N1 in front of you. There's the word and in that sentence. It's on page 293 of your appendix. And shall upon? Yeah. Why shouldn't that be read to say with respect to applications that contain? In other words, that it's telling you the effective date for applications filed after this 18-month period. So in other words, under that construction, it wouldn't be dealing at all with applications that were filed earlier and that would be subject to interferences. I read and simply to mean that this statute is doing two things. It's telling you the date that the statutory language change actually occurs. That was March 16th, 2013. And it's telling you what that statutory language applies to. Well, that's the problem because if it's telling you what it applies to and it's applying to new applications, not old applications, we can use that shorthand. That's correct. What this is saying is that Section 3, we have amended the patent system to go from first to invent to first to file. But those changes only apply to new applications. We're not going to impose those changes on people who filed under the first to invent laws. And I would point out, Your Honor, this language you see throughout the AIA. There are a number of provisions that have this construction where the amendment takes effect at a certain time but then shall apply to certain classes of patents and patent applications. 6C2A, 6F2A, 7E, all of these have that same construction where it's very clear that Congress was creating a transition from first to invent to first to file. And we know that's the case. Okay. Well, I guess you can take a moment on the merits of the Board's decision. The PTAB decision, yeah. Thank you, Your Honor. These cases go back to 1980, as you know, and we believe this Court should only review the PTAB decision if it concludes that the district court lacked jurisdiction. In 1980, these two parties were involved in two races. One race was to clone and isolate the DNA. The other one was to engineer that DNA into cells that would make the protein. Sagano filed a patent application in March 19, 1990. Did the PTAB make a mistake in issuing the shell cause order as to whether the protein claims were obvious over the DNA claims? We believe the PTAB made a very fundamental mistake in that, Your Honor. It was a mistake that ignored evidence, based a decision on with a lack of evidence, and was very much inconsistent with what the PTAB had done earlier on a number of occasions. No, but I don't think you're quite answering my question. They issued a shell cause order and said that the protein claims were obvious over the, were not patently distinct over the DNA claims. And are you challenging the issuance of the shell cause order? Yes. Well, first of all, because of the lack of enablement in Sagano, FEERS should have been senior party in this case, and so there should not have been, but aside from that, I'll address your question if I may, Your Honor. A part of obviousness is whether the prior arc even enables the production of the protein. We submitted a declaration by Dr. David Jackson that went through systematically why there was no enablement by the Sagano application. Now, what did Sagano's application teach? It taught the DNA sequence. I don't think you're answering my question. Are you challenging the issuance of the shell cause order? The PDO issued a shell cause order saying why the protein claims are patently distinct from the DNA claims. Are you arguing that they made a mistake in issuing the shell cause order? Well, I don't think they should have issued the shell cause order because that shell cause order was inconsistent with a number of decisions they had already made. Now, if I can explain why. The very claims that we're talking about here in the FEERS application were rejected over the Sagano case, were on appeal, and the board said that there was insufficient evidence to conclude that those claims were patentably indistinct from the DNA claims. But to be specific, what the board said was the examiner had not done a sufficient showing, and it doesn't take any position on the actual merits of whether the protein is obvious over the DNA nucleotide sequence. You're absolutely right, Your Honor. And what the board said was the examiner has not produced sufficient evidence from which we can conclude that they are patentably indistinct. So it's still an open question. What was the evidence that the examiner had? The Sagano application disclosed the DNA and the deduced amino acid sequence. It was exactly the same evidence before the board here. The board ruled then that evidence was not sufficient, ruled here that that evidence was sufficient, and ruled that because you could deduce the amino acid sequence, that was the sole basis for the board's decision on patentable distinctness. There's another point I'd like to make on this. It's kind of ironic, but the very reason Sagano is in this interference is because the board concluded that Sagano's DNA protein claims were patentably distinct from his DNA claims. His DNA claims were in the patent that issued from the earlier interference. The count was almost identical to the claim that he had in his 859 patent. The patent office allowed his protein claims over that patent, did not issue a double patenting rejection. There was never a restriction requirement in that case because he never presented protein claims in that case. Never issued a double patenting rejection, never issued a restriction requirement. And then the board allowed that and declared this interference. The only way you can justify that is for the board to have concluded that Sagano's protein claims were patentably distinct. Otherwise, he wouldn't even be in this interference. And I guess the other point I want to make is the irony here also is that we, that Feers, A, he put his claims in the application that's involved here in response to a restriction requirement. Section 121 says a prerequisite for a restriction requirement is patentable distinctness. But then Feers attempted, moved to add protein counts to the earlier interference, was denied that opportunity. And was told you can't do that unless you make a statement that is incorrect and you admit your case away. And I would submit, Your Honor, the law can't be that to avoid estoppel you have to make an incorrect statement to the patent office and admit your case away. Feers could not state that the claims were patentable to Sagano because they are not. We know that the claims corresponding to count one, this court has actually held that there is no support in the Sagano March patent application for those claims. So Feers was right. The question on estoppel is, did you attempt to add the claims and were you refused? And that's exactly what happened here. I would say the Stout v. Guggenheim and the N. Ray Ferlet cases say that there is no estoppel when that situation applies. I want to bring you back to the show cause order. If the show cause order was properly issued, then you had the burden of coming in to overcome the show non-obviousness, right? I think that's right. I think what the case law says is we had to make a prime official case. Okay. All right, thank you. We'll give you two minutes for a rebuttal. Thank you, Your Honor. Mr. Walden? Yes, sir. Please report. My name is Calvin Walden and I've reserved 11 minutes. My co-counsel, Mr. Burrell, has reserved three minutes and will address the issue specifically of whether the district court's transfer of the case to this court is reviewable by this court. That's what he's going to address? Yes, Your Honor. Help me out with the 3N and the word and in there. Does that mean that these amendments only apply to newly issued patents? I think that word and does do that. And I think it also makes clear for the second part of this clause which patents, what the subject matter it's referring to. It talks about patents and applications. So the first part of the clause in 3N1 there states that the amendments provided in this section shall take effect upon the expiration of the 18-month period. So that is why 146 being among the other provisions that were affected by Section 3 was amended in March of 2013 and therefore no longer says interferences. But if you look at the statute, it talks about derivation proceedings. The second part of the clause, it says and shall apply to any application for patent and any patents issuing their own that contains and what it describes there are claims that have been filed after what they call they've moved over to the first to file regime. So any application that contains first to file claims. So I think you put those two provisions together and what you see is that 146, for example, or other provisions 135, 102, and 103 were all amended in March of 2013. And then there's the second provision that says for those provisions that are dealing with patents and applications, we know that the amended versions of those statutes will be applicable to applications containing first to file claims. So what it's saying in your view is that after the 18-month period it's effective as to all applications new and old. That's correct. That's correct. I mean the new language of 146 or 135, for example, now talks about derivation proceedings. And those derivation proceedings are for first to file claims and then ultimately appeals of those are for first to file claims as well. And so when Biogen, for example, says that they find an affirmative grant of jurisdiction, which is what the district court needed out of 3-in-1, there simply is not that affirmative grant. At the end, what they're trying to make is a grant essentially out of 3-in-1 by negative inference. So you're saying it wiped out 146 after the 18-month period and then you needed Section 6 plus the technical amendments to restore some sort of review for that. That's correct. That's correct. That Congress actually made clear through different other provisions when it wanted to preserve essentially an old version of a statute or, in the case of 6F3C, wanted to what it said shall be deemed to extend. Even though it's been amended, it shall be deemed to extend to certain interferences even though the new language is for derivation proceedings. The concern I have with that position is that you're treating different amendments to different sections of the Patent Act under Section 3 of the AIA differently in the sense that you're saying, I think you're saying that as soon as March 16, 2013 kicked in, then the amended version of all those different statutes, 102, 103, 135, 146, apply to any and all pending patent applications and patents at the time. And I don't think that's right. I don't think that's right and I agree with you. You're doing some kind of splitting, as I understand it, in the sense that you think when it comes to the amendments to 102 and 103 that were done by the AIA Section 3, those are only for first-to-file patents. But for first-to-invent patents, the old 102 and 103 continue to live on. Likewise, why wouldn't that also be true for the other amendments in AIA Section 3? That is Section 135 and 146. Sorry to interrupt. I think that's exactly the right question. I don't believe it is us that's treating these provisions differently with a view for the AIA and the TCA, but I believe it's Congress. So, for example, for 135, we believe that 3N1 does not preserve necessarily an old 135. So what do you have to do? Why is that, though? We're being told by 3N1 that the amendments to all these different sections of the Patent Act are to apply to patents and patent applications that have an effective filing date after March 16, 2013. Right. Well, what 3N1 says is that, for example, 135 is going to be amended as of March 2013, and that the newly amended 135 will be applicable to applications that contain first-to-file claims. So 135 was amended, so no longer refers to interferences, but now refers to derivations. And then 3N1 says that newly amended 135 shall be a proceeding that's allowed for applications that contain first-to-file claims, meaning claims that were amended afterwards. Right. But we also, by the negative implication theme, you don't contest that for first-to-invent applications, the old 102 and old 103 apply to those. We don't. 102, 103 need to apply. Now, likewise, you're moving down that same train of negative implication that old 102 and old 103 apply for first-to-invent applications. Why wouldn't that likewise be true for old 135 and old 146 for first-to-invent applications? It's, I think, the right question, and I think the answer really boils down to, again, looking at each statute individually. For 102, 103, you have the amendment that was made by 3N1. The amended version of 102, 103 is going to be applicable to applications containing first-to-file or first-to-first-to-file. Isn't the answer that with respect to the old 102, 103, you don't have a provision comparable to 6F? Well, that's exactly. I mean, you don't have that. If you didn't have 6F in the technical amendments, you'd lose, right? I think it would be a closer call. I do believe, at the end, the court needs an affirmative grant, and even 3N1 without 6F3C doesn't give that affirmative grant. It's still a negative grant, but I do agree as well, though, that the one thing— It's a negative grant for old 102, old 103, right? I think for 102, 103, it's A, it can be that there can be such a negative grant. B, we need to answer the question, what did Congress intend? If we've amended 102, 103, that amended 102, 103 is only applicable to first-to-file claims, then what are we to do with first-to-invent claims, including patents that have been issued? And I think it's fair to say Congress did not mean to retroactively change 102 or 103 for any types of old patents that have been issued or applications that should be looked at under the first-to-invent regime. On the other hand, that's—OK, so that's 102, 103 that doesn't have its 6F3C. It doesn't have a need necessarily for an affirmative grant like the district court had. So it's a little different. If you take away 6F and the technical amendments, why wouldn't that same reasoning apply to 146? I think at the end, the 102, 103, the federal circuit did not need to have— what Congress intended. On the other hand, for 146, with an Article III court with limited jurisdiction, and they're saying that this jurisdiction is under the statute, that needs to be affirmatively granted by Congress. So there's a difference in that. I'm not following that. I'm sorry. I guess the only difference, I believe, is that 102, 103 you may find by negative implication. 146 you're not allowed to find. The district courts are not allowed to find by negative implication. I don't know why not. I mean, you're construing the statute and seeing whether 146 still exists. And if 146 still exists, then there's an explicit grant of jurisdiction. Well, at the end of the day, if all you had was 3 and 1, I think it would be presenting a very difficult question for the court. But you don't, right? You have 6F3C as well. And 6F3C is where Congress very explicitly indicated where it wanted— 6F3C very clearly said that Section 146 was as amended. And then it very also clearly said that as amended statute, nonetheless, would be extended to interferences that were declared before the September 2012 date. It just is not ours. So without 6F3C, I do agree that 3 and 1 would present a difficult question for the district court and for this court. But with 6F3C, it's a real tiebreaker. There's no ambiguity where Congress intended for there to be review under 146 for interference proceedings. They made it clear. And then they further made it clear in the Technical Corrections Act. When in that part of the—in the Technical Corrections Act, the provisions that you were talking about earlier, there they did two things that they made clear. One is they made clear there should continue to be interference proceedings for interferences that can be declared after the September 2012 date. And then second, they made clear there can be appeals of those under Section 141 and 1295A4A to this court. They clearly didn't put 146 in there. They revived, in a sense, 135. They revived 141. They simply didn't revive 146. So because they didn't save 146 in the Technical Corrections Act, you think there's a negative implication there that they didn't want to use 146 or make 146 available. However, we shouldn't use the negative implication theory when it comes to understanding 3 and 1. Not quite. Not quite. It is the—Biogen's burden, and it was, to show that there was an affirmative grant. We don't believe they can do that by negative implication. What I'm saying is there is no affirmative grant in 3 and 1, certainly not in 6F3C, not in the TCA either. And indeed, if you look at all of those provisions together, what you see is that Congress intended to preserve certain rights for interferences and for appeals of those interferences. But what they clearly didn't do is intend to preserve a right under 146. Why is the provision for judicial review under 141 and 146 that's provided for in 6F3C located in Section 6 of the AIA, which is all about post-grant review? It's a good question. It's not entirely clear. It's the very end of Section 6, and it doesn't necessarily, in my view, jive with the entire rest of that section. Because that Section 6F seems to be contemplating the possibility of a pending interference somehow being converted into a post-grant review. That's right. How is that possible? Well, Congress—essentially by Congress allowing this. What the Congress said in 6F3A, the first part of that final subsection of 6, it granted the commissioner the authority, if he wanted, to do away with pending interferences. Those that had already been declared in favor of post-grant proceedings. But I guess what I'm wondering is interferences are for first-to-invent patents in patent applications. Yes. Post-grant review are for first-to-file patents in patent applications. Congress did not exactly explain how the director was necessarily going to be able to transition that way. I think what would have happened would be that the interfering parties would either get their patents or not get their patents. And then if they didn't get a patent, and the other party did, then they would try to initiate some kind of post-grant review at that time. In which case, the commissioner would have to allow for that. Ultimately, that's not what occurred. What occurred is that the board has decided that 135 interferences should continue, and they should continue for applications containing first-to-invent claims. And so that's, we believe, fully supported under Section 135. What's not fully supported now for all interferences are appeals under Section 146. And those are reserved only under 6F3C for those interferences that had already been declared as of the September effective date. I want to spend a minute on the merits here, and particularly address the question of whether the show-clause order was properly issued. Because I understand Mr. Aulis to agree that if the show-clause order was properly issued, then the burden fell on them to make a pre-manufactured case of non-obviousness. And of course, they didn't do that. I apologize for interrupting again. FEERS did not, as we've seen it in the record, did not object to the propriety of the order to show-clause. FEERS did attempt to respond to the order to show-clause, we say, ineffectively and without providing sufficient evidence. So we don't disagree in that sense. Then the burden was on FEERS, was on Biogen, to demonstrate that equitable estoppel, or I'm sorry, that interference estoppel should not apply. So then the board was then presented with the evidence that was given by the parties. And the board did ask for FEERS to demonstrate why the new claims to the protein are patently distinct over the earlier claims to the DNA. And FEERS, we submit, simply did not present any evidence to demonstrate patentable distinction between the protein claims and the earlier DNA claims. Just as importantly, we submit, FEERS did not show that it was not, shouldn't be estopped under the other types of equitable estoppel that we describe in our papers and that are set out in Woods v. Suchia. For example, the current claims that FEERS was trying to add to this latest, the third, the 939 interference, simply read on the disclosure of Sugano going all the way back to the 096 interference. It's the same disclosure in this third interference as it was in the first one, and it's the same disclosure as it was in the second one. So not only did FEERS not show a patentable distinction between protein claims and DNA claims, but even more fundamentally, FEERS did not explain why it should, in this third interference, be able to bring protein claims when we had a protein disclosure going all the way back to 1980 and they didn't bring it in. I think part of the point was that the original Japanese disclosure didn't disclose the protein sequence, and it tried to, you know, trigger an interference on account for the protein, and it was blocked by the board in the first interference, and so it feels like it should be given that opportunity to finally resolve that question now, especially given that Sugano has claims now in an application seeking the protein. It is an argument that FEERS has made, and we believe it's in error for at least three reasons. First, their concentration on our Japanese disclosure is the incorrect view. As the board noted, they put in a declaration from their expert, Dr. Jackson, and the board dismissed it because it was all about the Japanese application. But Interference Estoppel doesn't look at that issue, the ultimate issue of priority, and whether we can show a first to invent necessarily. It looks at our disclosure in the earlier interferences, in other words, at our earlier U.S. application. Well, let me just ask you a more conceptual question. Yes. If a party in an original interference wanted to litigate an issue, and the board, for whatever reason, said, no, I'm not going to let you litigate that, should it be blocked from litigating that issue later if that issue now is very ripe? If the party truly tried to get that issue before the board, and then it did try to exercise its opportunity to have that attempt reviewed, then there may be some level of equity that would say, okay, you do get to have a second bite. Well, even if the protein was obvious over the DNA? Well, no. No, I don't believe that's the case. I believe they would still be obligated to show that the protein is obvious over the DNA. What if it was? Not obvious, I apologize. What if it was? Let's just take it for granted that it was a patently indistinct invention that they wanted to add earlier, and they did everything properly to try to add that patently indistinct count, but were blocked by the board. So they did everything they could possibly do to present a patently indistinct invention into an interference, and the board incorrectly blocked them. And now they want to try to bring it again. Are you going to say that they are a stop based on a board's incorrect determination in the earlier interference? In that case, I think it would be, because there's already been a… Would be what? There would be a stopple. There would be. There would be. Then there's just absolutely no opportunity then in any situation. I would say they had the opportunity in this case, in that hypothetical, in the earlier interference, they did have the opportunity. If the claims or the counts are indistinct, they've already litigated indistinct counts in the earlier interference. And so if they have indistinct counts later, those issues really have been resolved. But again, we don't believe that FEERS took all opportunities to try to get the protein counts either into the 096 interference or, just as importantly, into the second one, the 661 interference. So FEERS did file a motion in the 096 interference to try to add protein counts. Did FEERS ultimately get a patent on the DNA claim? FEERS, yes, well, has not gotten a patent on specifically a DNA claim, no. FEERS, as I understand it, has gotten patents on certain methods of using the ultimate protein, but not under the underlying DNA claim, no. Those patents have been granted to Sugamo. The DNA claim? Yes, yes. And so I'll just wrap up with this point about whether they've exercised all their opportunities. They had the opportunity to add the protein claims in the 096 patent, in the 096 interference. They say they tried. We've shown, I believe, why that was defective. They further had an opportunity to get protein claims, or at least they should have tried harder to get protein claims into the 661 interference. This is a whole second interference. That interference, they were found, again, to be stopped based on the earlier 096 interference. They did not try to appeal that. They did not try a 141 appeal. They did not try a 146 appeal. As the board found, Sugamo was entitled, in a sense, to feel that these issues had been resolved. To 661, if not from the 096 interference, certainly by then the 661 had been resolved and not appealed. These issues were final. So now we're in a third interference under the same specifications, third bite at the apple. We believe that the board properly issued the order to show cause, just like it did in the 661, and that FEERS did not respond properly to the order. Okay, so let's throw other questions. I think we're out of time. Oh, I think we're out of time. Good morning. May it please the court. David Burrell for Bayer Pharma AG. This court is sitting at the transferee court from the district court's order transferring Biogen's 146 action here. There is no appeal from the District of Massachusetts. There is no final judgment from the District of Massachusetts. There was no notice of appeal ever filed from the District of Massachusetts. Biogen comes into this court and asks it to invoke its jurisdiction under 1295A1. So we were wrong in TELUS. No, you were absolutely correct in TELUS. TELUS was a dismissal for lack of... We said it shouldn't be treated as a dismissal. It should be treated as a transfer. Well, as to the threshold jurisdictional question, which is, in the first instance, what must be confronted by the appeals court, there was absolutely jurisdiction in TELUS under 1295A1. Once that threshold matter was resolved, it was within the court's discretion to treat the appeal however it wanted. And the court concluded it should have transferred rather than dismissing the case. But that threshold question in TELUS had a final judgment. So jurisdiction could be invoked under 1295A1. That final judgment is absent here. And Christensen v. Colt dictates that that threshold jurisdictional question must be assessed. Is there jurisdiction in this court? And if the answer to that question is no, this court is powerless to consider the merits. And the Supreme Court said that all the Federal Circuit can do at that point is simply dismiss that aspect of appeal. Do we have power to look at our own jurisdiction? Yes, that is the only question that this court can answer. Then doesn't 146 say something? Like if a 146 action is filed, then you're blocked from going to 141 and the Federal Circuit loses jurisdiction? That's what Biden's arguing here, that there can't be jurisdiction concurrently in a 146 action and a 141 action. Respectfully, that misreads the jurisdictional analysis under Section 1631, which looks to not whether there can now be concurrent jurisdiction between the Federal Circuit and the District of Massachusetts. The point is that there's a legitimate 146 civil action that was filed that preempts the Federal Circuit's ability to review that case. Respectfully, I disagree, Your Honor. Under Section 1631, the question is whether the transferee court is a court in which the action could have been filed at the time it was noticed or filed. So the question is not whether there could be a 141 action now after Biden has filed this 146 action, but rather whether there could have been jurisdiction in this court under 141 at the time Biden filed this 146 action. And the answer to that question unequivocally is yes. Biden, in fact, invokes this court's jurisdiction under 1295A4 to review the board's decision in the interference. That's on page one of its principal brief. So the only remedy is mandamon? No, they have several remedies. At the time that the district court disagreed with Biden, they could have sought certification under Section 1292 and asked the district court to certify this question for the Federal Circuit. They could have sought mandamus. They could have taken a dismissal as in PELOS and simply either relied on PELOS or filed a prophylactic appeal under 141. A dismissal which we said was improper. A dismissal which was reviewable, and that would have given this court the opportunity to review the underlying action of the district court as it did in PELOS. But Biden didn't want to take a dismissal. It didn't want to have some risk for whatever strategic reason that it would be dismissed. One can't ask the district court for dismissal, to avoid dismissal and rather transfer, and then have the benefit of appeal of the underlying decision. Biden chose not to have a final order. Biden chose to be postured differently than the appellant in PELOS. And there are consequences to that. And the consequence is that there's no final order here. And the law is clear that the absence of a final order divests this court of jurisdiction under 1295A1. Okay. I think, Mr. Perl, we're out of time on that. Thank you very much. Thank you, Greg. Mr. Olive. Mr. Figg. Oh, Mr. Figg. I'm sorry. Mr. Figg. Going back in time. I'll give you another minute. Thank you, Your Honor. I want to go back briefly to the subject matter jurisdiction issue. I think counsel made a very significant concession to one of the court's questions, which was what if 6F3C were not there? Would 3 and 1 then provide the avenue for judicial review? And he said, yes, in that situation it would. Well, let's really analyze the argument they're making. First of all, their analysis of these two sections leads to two different dates that they say judicial review was eliminated. They say on March 16, 2013, when the Section 3 amendments came into effect, that swept away the old version of the laws. And so there was no opportunity for appeal for interferences declared after that date. But then they say, look at 6F3C. 6F3C, by negative implication, says there was no right to judicial review for interferences declared after September 16, 2012. A construction that gives you two separate dates, it can't be a correct construction. And the latter point is the main argument they make, that 6F3C, by negative implication, eliminated all judicial review for interferences declared after September 16, 2012. I think we need to test that. And we can show that that's not true. Let's say that the interference was declared on October 1, 2012, after September 16. And it basically ran the same course as the case we have here. And so on March 1, a final decision is entered by the Patent Office Board. And on March 2, the losing party brings an action for 146 review. At that time, Section 146 had not been amended. It gave the applicant the right to bring that 146 action. No one can dispute that. It wasn't that 146 at that point said BPAI, but 7A was in effect at that time, and said you treat BPAI as if it said PTAB. And so we can demonstrate that the core of their case, that 6F3C eliminated the opportunity for judicial review of everything declared after September 16, 2012, is just wrong. Now the only difference between that hypothetical and the case we have here is that this case was declared in July of 2013. So it was after those Section 3 amendments took effect. That's why the shall apply language is so important. The 3N1 says the amendments of Section 3 shall apply to applications after March 16, 2013. So I think it all fits together. 6F3C does not alter that. It simply was Congress' way of saying we didn't fix all the problems with 3N1 because we still have a problem with interferences that were pending when these changes came into effect in September of 2012. We need to fix that. And they fixed that with 6F3C. Can I just comment very briefly, Your Honor, on this Court's jurisdictional... Yeah, go ahead. Yeah, I think the problem is the basic... The appellees cite cases that say transfer order is an interlocutory appeal and it's not an interlocutory order and it's not normally appealable because the case will continue in another court. It doesn't end the case. It simply moves it to a different court. Your point is it's not an interlocutory appeal. It's not because here there's no question. The district court, by its literal words, said I'm granting the motion to dismiss. And what it did was it dismissed the civil action that Biogen brought not to be carried on in another court. This court is not going to supervise discovery or hold an evidentiary hearing. That 146 action was gone forever once the Massachusetts court dismissed it. It is a final decision. 1295A1 does give this court authority to review it, just as this court did in the Tellus case. And as we pointed out in our reply brief, 1631 also gives this court the power to send it back because if we were right and if the district court did have jurisdiction over the 146 case, then this court doesn't have jurisdiction over the 141 case. Okay. Thank you. Thank you very much, Your Honor. Thank all counsel. The case is submitted.